UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EDGAR URIBE, | |
| Plaintiff, | **MEMORANDUM OPINION AND ORDER** |
| -against- | |
| KELLOGG'S SNACKS/ KEEBLER, INC., | 05 Civ. 02959 (PGG) |
| Defendant. | |

PAUL G. GARDEPHE, U.S.D.J.:

In this action, Plaintiff Edgar Uribe claims that Defendant Kellogg's Snacks/ Keebler, Inc. ("Keebler") violated 42 U.S.C. § 1981 ("Section 1981") and New York Executive Law § 296 by terminating his employment because he is Hispanic. (Cmplt. ¶¶ 34-35) Keebler has moved for summary judgment with respect to both claims, arguing that it terminated Uribe's employment solely because it believed Uribe had violated its policies prohibiting workplace violence. (Def. Br. at 1) For the reasons stated below, Keebler's motion (Docket No. 20) is GRANTED.

**I.    FACTS**

Uribe was employed by Keebler as a driver and warehouseman at Keebler's distribution center in Orangeburg, New York from December 15, 1999 until July 15, 2004. (Def. Rule 56.1 Stat. ¶¶ 1, 6, 20)[1]

---

[1] Uribe did not include any citations to evidence in his Response to Keebler's Rule 56.1 Statement. Thus, he could be deemed to have admitted all statements of fact in Keebler's Rule 56.1 Statement. See Local Rule 56.1(c)-(d) ("Each numbered paragraph in the statement of material facts set forth in the [movant's] statement . . . will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the [non-movant's] statement . . . . Each statement by [either

     A.      **The June 29, 2004 Incident**

On June 29, 2004, a physical altercation occurred between Uribe, who is Hispanic, and his co-worker Walter Smith, who is not Hispanic[2] and who serves as the union shop steward, in the drivers' break room. (Def. Rule 56.1 Stat. ¶ 12;[3] Pltf. Ex. 11 (Uribe Statement)) According to Uribe, the incident began when the door to the room opened, creating a breeze. (Pltf. Ex. 11) Uribe "sa[id] real loud 'Close the door,'" because the breeze was disturbing his paperwork. (Id.) Smith then came toward him, saying "I'm going to show you, mother fucker, how you got to talk to your shop steward," and that he wanted to kill Uribe. (Uribe Dep. 43:5-11, 43:18-23) Smith then pushed Uribe "real hard" into some mailboxes and onto a table. (Pltf. Ex. 11) Uribe put his hands on Smith's hands or arms. (Uribe Dep. 45:20-23) Two other employees, Bob Bizzoco and Milo Selin, pulled Smith and Uribe apart, and Smith left. (Id.)

Uribe reported this incident to a supervisor on June 30, 2004. (Def. Rule 56.1 Stat. ¶ 15) Joseph Didio, Uribe's supervisor, consulted the company's labor relations department that same day and then took statements from Uribe and Smith. (Def. Rule 56.1 Stat. ¶¶ 11, 15; Didio Dep. 23:8-20; Reczek Aff. ¶¶ 1-4) Uribe also showed

---

party] . . . <u>must be followed by citation to evidence which would be admissible</u>."). However, in deciding Keebler's motion, the Court has relied on statements of fact from Keebler's Rule 56.1 Statement only if they were expressly admitted by Uribe or were not put into dispute by any of the admissible evidence cited in Uribe's Rule 56.1 Counterstatement.

[2] Plaintiff has not cited admissible evidence establishing Smith's race, ethnicity or national origin. However, the Court will assume that Smith is not Hispanic for the purpose of deciding Keebler's summary judgment motion.

[3] Keebler's Rule 56.1 Statement states that the altercation occurred on July 29, 2004, but the evidence shows – and the parties do not appear to dispute – that it actually occurred on June 29, 2004. (<u>See</u> Def. Br. at 5; Pltf. Br. at 2)

Didio a mark on his back, which he claimed had been caused by Smith pushing him. (Didio Dep. 57:20-58:4)

In his statement, Smith wrote that Uribe had "yelled, 'Shut the fucking door,'" and that as Smith had walked toward Uribe to retrieve his lunch bag, he and Uribe continued to "exchange[] words." (Pltf. Ex. 1)  Smith also stated that Uribe head-butted him, after which he pushed Uribe. (Id.)

Didio faxed Uribe's statement to the company's Director of Labor Relations, Tom Reczek. Reczek, who was based at the time in Elmhurst, Illinois (Didio Dep. 12:25-13:3), instructed Didio to suspend Smith and assigned Lyn Frantz of the Company's human resources department to investigate Uribe's allegations. (Didio Dep. 26:13-22; Reczek Decl. ¶¶ 5-6)  Didio suspended Smith on June 30, 2004. (Def. Rule 56.1 Stat. ¶ 15; Didio Dep. 27:7-18)

### B. Keebler's Investigation

On July 1 and July 2, 2004, Frantz conducted telephone interviews of Smith, Uribe and the three other employees who had been in the driver's room when the incident occurred. (Def. Rule 56.1 Stat. ¶ 16; Def. Ex. 14)  Frantz's notes of the Smith interview state that Smith said "that he never touched [Uribe]." (Id.)  Frantz's notes of her interview of Uribe describe Smith's alleged threats, and also state that Uribe said that his head and Smith's "may have touched when he was trying to get [Smith] off of him but it wasn't an intentional head butt." (Id.)

Of the three employees present in the room, one – Eric Slockblower – told Frantz that he had seen nothing. (Def. Rule 56.1 Stat. ¶ 16)  The other two employees, Bob Bizzoco and Milo Selin, told Frantz that the incident occurred when Smith opened the door to the driver's room and Uribe shouted "close the fucking door." (Id. ¶ 17; Pltf.

3

Ex. 4 (notes from Bizzoco interview))  Frantz's notes state that Bizzoco and Selin confirmed Smith's statement that Uribe had "head-butted" Smith, and that Selin reported that the head-butt occurred before Smith grabbed Uribe.  (Id. ¶ 18; Pltf. Ex. 4 (notes from Bizzoco interview, also stating that Bizzoco had been in the restroom at the beginning of the incident); Pltf. Ex. 5 (notes from Selin interview))

### C. The Resulting Disciplinary Actions

Reczek "reviewed the results of . . . Frantz'[s] investigation," concluded that both Smith and Uribe had "willingly participated in the altercation," and decided that Uribe should also be suspended.  (Reczek Decl. ¶ 7)  Accordingly, at Reczek's direction, Warehouse Manager Tara Cantatore informed Uribe in writing on July 6, 2004 that he was "immediately suspended pending final resolution of an investigation" into the June 29 incident, and that the incident was a "serious and direct violation of Kellogg's/ Keebler 'Workplace Violence Policy'" and the governing agreement between Keebler and Uribe's union.  (Pltf. Ex. 12; Reczek Decl. ¶ 7)

Keebler's workplace violence policy prohibits, inter alia, "unwelcome touching of another employee," "[v]erbal threats," and "[a]ggressive or hostile behavior that creates a reasonable fear of injury to another person or subjects another individual to emotional distress."  (Def. Ex. 6)  The policy states that employees who violate the policy may be terminated.  (Id.)[4]  During the relevant time period, Keebler also maintained a "Rules and Policies" statement listing conduct that might result in termination of employment, including "[s]triking, threatening or using abusive language toward other

---

[4] Keebler has offered evidence, which Uribe has not put into dispute, that Uribe attended a training session in June 2001 at which the workplace violence policy was discussed. (Def. Ex. 7)

4

employees." (Def. Ex. 8) Finally, the agreement between Keebler and Uribe's union listed "assault or fighting during working hours" as grounds for discharge. (Def. Ex. 9)

After the Company completed its investigation, Reczek concluded that both Smith and Uribe had violated Keebler's workplace violence policy, its "Rules and Policies" statement, and the union agreement. (Reczek Decl. ¶ 8) Based on this determination, Reczek decided that both employees should be dismissed, and on July 15, 2004, Smith and Uribe's employment was terminated. (Def. Rule 56.1 Stat. ¶ 20; Reczek Decl. ¶ 8)

Both employees filed union grievances challenging their termination. (Def. Rule 56.1 Stat. ¶ 20) Keebler offered to resolve the grievances by reinstating both employees on the condition that they sign a Memorandum of Agreement containing, inter alia, the following provisions: (1) an acknowledgment that the employee had been discharged for violating Keebler's "Work Place Violence Policy"; (2) a statement that the employee would be reinstated without loss of seniority, but would not be paid for the suspension period; (3) a statement that the employee would "not take legal action against the Company or the Union"; (4) a statement that the employee "must become and remain a satisfactory employee in every respect, including job performance and attendance"; and (5) a statement that any future violation of the workplace violence policy "will result in immediate termination." (Pltf. Ex. 6)

Smith signed the Memorandum of Agreement, but Uribe refused to do so. (Def. Rule 56.1 Stat. ¶¶ 21, 23; Pltf. Ex. 6) Keebler continued to negotiate with the Union, however, and ultimately presented a modified Memorandum of Agreement to both employees which did not contain the requirement that each "remain a satisfactory

employee in every respect."  (Def. Rule 56.1 Stat. ¶¶ 21-23; Pltf. Ex. 6; Pltf. Ex. 7)  Smith signed the modified agreement.  (Def. Rule 56.1 Stat. ¶¶ 21-22)

Union representative Ken Bohan told Uribe that the Company was willing to offer him an agreement that did not require that he "remain a satisfactory employee in every respect."  (Uribe Dep. 84:2-4, 99:22-100:25; Reczek Decl. ¶ 11 (stating that Uribe was offered the same modified agreement as Smith))  However, Uribe told Bohan that he would not sign an agreement containing any of the provisions that were listed in the original Memorandum of Agreement.  (Uribe Dep. 101:8-19; Def. Rule 56.1 Stat. ¶¶ 23-24)[5]

Keebler then reinstated Smith, even though both men had been told that they would be reinstated only if they <u>both</u> signed the Memorandum of Agreement.  (Uribe Dep. 95:16-96:9; Reczek Decl. ¶ 13)  Reczek testified that he made the decision to allow Smith to return to work even though Uribe had not signed the agreement, and that he would have done the same if only Uribe had signed the agreement.  (Reczek Decl.¶ 13)

---

[5] In his response to Keebler's Rule 56.1 Statement, Uribe denies Keebler's assertion that he rejected the modified Memorandum of Agreement.  (Pltf. Rule 56.1 Response ¶ 23)  Uribe provides no citations to supporting evidence, however.  Instead, he appears to rely on his counsel's declaration asserting that "at no time was Mr. Uribe ever presented – by his union or by management – with an agreement like . . . the one which Smith later signed and which formed the basis for his return to work."  (Sussman Decl. ¶ 3)  However, the issue is not whether Uribe was ever given a copy of the modified Memorandum of Agreement, but whether he was offered and rejected an agreement on the same terms as Smith.  Uribe's counsel's declaration cannot create a dispute of fact on this issue in light of Uribe's deposition testimony that his union representative told him that Keebler would offer him an agreement in the form of the modified Memorandum of Agreement, and that Uribe told the union representative that he would not sign it.  (Uribe Dep. 84:2-4, 99:22-100:25, 101:8-19)

Uribe's union filed a grievance concerning his termination. The arbitrator sustained the termination, however, after concluding that the evidence showed that Uribe "engaged in an assault and a fight during working hours which was a ground for immediate discharge." (Def. Rule 56.1 Stat. ¶ 27; Def. Ex. 21 at 9) Uribe then brought this lawsuit.

## DISCUSSION

Summary judgment is warranted if the moving party shows that "there is no genuine issue as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor," Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008), and the Court "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment," Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001).

"It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases," and that "the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to . . . other areas of litigation." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001). As in any other case, "an employment discrimination plaintiff faced with a properly supported summary judgment motion must 'do more than simply show that there is some metaphysical doubt as to the material facts'. . . . She must come forth with evidence sufficient to allow a reasonable jury to find in her favor." Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

The Court is mindful that "direct evidence of . . . [discriminatory] intent will only rarely be available, . . . [so] affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008) (internal quotation omitted). However, the Court must also "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture." Bickerstaff v. Vassar Coll., 196 F.3d 435, 448 (2d Cir. 1999).

## I.   URIBE HAS NOT OFFERED EVIDENCE FROM WHICH A JURY COULD FIND UNLAWFUL DISCRIMINATION

Uribe's discrimination claim[6] rests entirely on his assertion that Keebler treated him unfairly by imposing the same discipline on him and Smith, when Smith's conduct on June 29 was allegedly worse than Uribe's. (Pltf. Br. at 9-14)  Keebler is

---

[6] Plaintiff characterizes his claim as one for discrimination based on his "Hispanic national origin." (Cmplt. ¶¶ 3-4, 34-35)  Defendants argue that his Section 1981 claim should be dismissed because a national origin discrimination claim cannot be brought under that statute. (Def. Br. at 23-24)  However, a Section 1981 claim may be brought on grounds of discrimination based on race or ethnicity, and courts have recognized that a claim for discrimination based on Hispanic origin may be viewed as a race or ethnicity-based discrimination claim as well as a national origin claim. See Albert v. Carovano, 851 F.2d 561, 572 (2d Cir. 1988) (holding that "'race' for the purposes of Section 1981 comprehends ethnicity" and that plaintiffs could potentially assert a Section 1981 claim based on allegations of discrimination against "Latin" individuals); Alonzo v. Chase Manhattan Bank, N.A., 25 F. Supp. 2d 455, 459 (S.D.N.Y. 1998) (noting that "the term 'Hispanic' may trigger the concept of race," and allowing a plaintiff who had "stated his belief that he was discriminated against because he is Hispanic" to assert both national origin and race discrimination claims, although he had only asserted a national origin claim in his EEOC charge).  Therefore, the Court will not dismiss Uribe's Section 1981 claim on the ground that he describes it as one for discrimination on the basis of "national origin." See also Cruz v. Coach Stores, Inc., 202 F.3d 560, 564, 569 (2d Cir. 2000) (considering race discrimination claim of Hispanic employee, and also holding that under Fed. R. Civ. P. 15(b), a court "may consider claims outside those raised in the pleadings so long as doing so does not cause prejudice").

8

entitled to summary judgment, however, because Uribe has not offered sufficient evidence to establish a prima facie case of discrimination or to allow a jury to find that Keebler's stated reason for terminating his employment was a pretext for unlawful discrimination.

### A. Applicable Standards

In analyzing employment discrimination claims under Section 1981 and New York Executive Law § 296, courts use the same standard that applies in Title VII cases. McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997) (treating Section 1981 employment discrimination claim as analogous to Title VII claim); Carrion v. Local 32B-32J Serv. Employees Int'l Union, AFL-CIO, No. 03-Civ.-1896(THK), 2005 WL 659321, at *10 (S.D.N.Y. March 21, 2005) (using Title VII framework to analyze employment discrimination claims under Section 1981 and New York Executive Law § 296).

> Under the Title VII framework:
>
> [T]he plaintiff bears the initial burden of establishing a prima facie case of discrimination. If the plaintiff does so, the burden shifts to the defendant to articulate "some legitimate, non-discriminatory reason" for its action. If such a reason is provided, plaintiff may no longer rely on the presumption raised by the prima facie case, but may still prevail by showing, without the benefit of the presumption, that the employer's determination was in fact the result of . . . discrimination. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."

Holcomb, 521 F.3d at 138 (citations omitted).

### B. Plaintiff Cannot Establish a Prima Facie Case

To establish a prima facie case, a plaintiff must show: "(1) that he belonged to a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent."

9

Holcomb, 521 F.3d at 138. A plaintiff's burden in establishing a prima facie case "'is not onerous'" – indeed, it is "de minimis," Beyer, 524 F.3d at 163 – and is satisfied by "evidence that raises a reasonable inference that the action taken by an employer was based on an impermissible factor." Holcomb, 521 F.3d at 138 (quoting Burdine, 450 U.S. at 253). However, while a low standard applies to the prima facie case determination, "a plaintiff's case must fail if he cannot carry this preliminary burden." Beyer, 524 F.3d at 163.

Keebler asserts that Uribe cannot establish the fourth element of his prima facie case because, on the undisputed facts, his termination did not occur under circumstances giving rise to an inference of discrimination. (Def. Br. at 14-19) Uribe argues that a jury could infer that he was treated in a discriminatory manner because – although his behavior was not as serious as Smith's – Keebler nonetheless imposed the same discipline on both he and Smith.[7] (Pltf. Br. at 7-13)

---

[7] Uribe also asserted in the Complaint that Smith made racist comments. (Cmplt. ¶ 27; see also Uribe Dep. 124:18-25 (testifying that approximately once a week, Smith would comment that Uribe was a "grass cutter," "not a truck driver"; would speak of "finagl[ing] a Spaniard"; or say "something about how easy a Spanish woman can be")) Assuming arguendo that these comments were made, they would not provide a basis for denying summary judgment. The question is not whether Smith expressed discriminatory animus, but whether Reczek, the manager who decided to terminate Uribe's employment, acted with discriminatory intent, and Smith's comments are not probative on that point. Uribe has not offered any evidence that Reczek – sitting in an office in Illinois – knew of Smith's alleged comments or was in any way influenced by Smith when he made the decision to terminate Uribe's employment. To the contrary, Uribe testified that he never objected to or complained to anyone about Smith's comments. (Uribe Dep. 125:8-14) Thus, no jury could rationally infer that Reczek acted with discriminatory intent based on Smith's comments. See Tomassi v. Insignia Financial Group, Inc., 478 F.3d 111, 115-16 (2d Cir. 2007) (stating that "all comments pertaining to a protected class are not equally probative of discrimination," and explaining that "[t]he relevance of discrimination-related remarks . . . depend[s] . . . on their tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class" (emphasis added));

Under the circumstances here, however, the mere fact that Keebler imposed the same discipline on Uribe and Smith for different conduct could not rationally give rise to an inference of discrimination. It is undisputed that Keebler's policies against workplace violence warn that the same discipline (i.e., termination) might be imposed for a range of conduct, including using abusive language, making threats, or actually striking another employee. (See supra pp. 4-5) It is also undisputed that Reczek, the decisionmaker, believed that Uribe had violated those policies. (See id.) Therefore, in the absence of evidence showing that Reczek gave more lenient treatment to an employee who he believed had engaged in conduct similar to Uribe's, it would be pure speculation for a jury to infer discriminatory intent from the fact that Reczek decided, as authorized by Keebler's policies, that Smith and Uribe should both be terminated.[8]  See, e.g., Courtney v. Oregon Dep't of State Police, No. 06-Civ.-6223, 2008 WL 2726931, at *4 (D. Or. July 11, 2008) (holding that plaintiff who argued that he should have received more lenient treatment had not established prima facie case because, "[i]n the absence of any comparator evidence, . . . plaintiff's contention is impossible to test").

---

see also McLee, 109 F.3d at 137 (evidence of racial bias on part of employee who did not make decision to fire plaintiff and was not consulted about decision "provide[s] no basis for imputing to . . . [the decision-maker] an invidious motivation for discharge").

[8] Ordinarily, where a plaintiff attempts to establish a prima facie case by showing that he received unwarranted discipline, he must "show that similarly situated employees who went undisciplined engaged in comparable conduct." Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000). Here, in contrast, Uribe argues that he and Smith were not similarly situated and did not engage in comparable conduct. (Pltf. Br. at 5, 13) However, he does not cite any case law to support his contention that he can establish a prima face case by showing that someone who was not similarly situated to him – and engaged in different conduct – received the same discipline. Nor has Uribe identified any employees who were similarly situated and who engaged in similar misconduct but were not terminated.

11

### C. Plaintiff Has Not Offered Evidence That Keebler's Stated Reason for His Termination Was a Pretext for Discrimination

Even if Uribe had established a prima facie case, Keebler would still be entitled to summary judgment. Keebler has offered a legitimate, non-discriminatory reason for terminating Uribe's employment: Reczek, Keebler's Director of Labor Relations, concluded based on an investigation conducted by a human resources department employee that Uribe had violated Company policies and a union collective bargaining agreement prohibiting workplace violence. (See Def. Br. at 19-10; supra pp. 4-6)

Thus, to defeat summary judgment, Uribe must "raise[] sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that the decision to fire him was based, at least in part, on the fact" that he is Hispanic. Holcomb, 521 F.3d at 141. Like most plaintiffs, Uribe attempts to meet his burden by showing that "the employer's stated reason for the adverse employment action is entirely pretextual." Holcomb, 521 F.3d at 141 (explaining that "in many cases, a showing of pretext, when combined with a prima facie case of discrimination, will be enough to permit a rational finder of fact to decide that the decision was motivated by an improper motive").

Uribe argues that summary judgment is not appropriate here because, viewing the evidence in the light most favorable to him, he received the same discipline as Smith for less serious conduct. (Pltf. Br. at 13) However, "[i]n determining pretext, the issue is not whether the employer reached a correct conclusion in attributing fault with respect to workplace altercations, but whether the employer made a good-faith business determination." Baur v. Rosenberg, Minc, Falkoff & Wolff, No. 07-Civ.-

12

8835(GEL), 2008 WL 5110976, at *5 (S.D.N.Y. Dec. 2, 2008); see also McPherson v. New York City Dep't of Educ., 457 F.3d 211, 216 (2d Cir. 2006) ("In a discrimination case . . . we are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what motivated the employer. . . ." (emphasis in original) (internal quotation omitted)); Argueta v. North Shore Long Island Health Sys., Inc., No. 01-Civ.-04031(JG), 2003 WL 22670915, at *5 (E.D.N.Y. Nov. 6, 2003) (where the employer's alleged reason for firing the plaintiff was that she had struck a co-worker, the "relevant inquiry [wa]s not what happened [– i.e., whether the employee "actually struck her coworker" –] but rather, what the decisionmakers believed happened" (emphasis in original)); Agugliaro v. Brooks Bros., Inc., 927 F. Supp. 741, 747 (S.D.N.Y. 1996) ("Even assuming defendants were wrong in their belief that plaintiff had engaged in sexual misconduct, what is significant is that they based their decision to dismiss plaintiff on that belief, and not on his age, gender, or pension status.").

Thus, the question is not whether Reczek was mistaken or incorrect about Uribe's and Smith's roles in the incident, but whether Reczek had a good faith belief that Uribe's conduct warranted termination under Keebler's policies. In the absence of any evidence undermining Keebler's assertion that it "reasonably believed" that Uribe had violated its policies, or of any other evidence of pretext or discriminatory intent, Keebler is entitled to summary judgment. Ascione v. Pfizer, Inc., 312 F. Supp. 2d 572, 578-79 (S.D.N.Y. 2004); see also Maturine v. Am. Int'l Group, Inc., No. 04-Civ.-9064(GBD), 2006 WL 2347806, at *4 (S.D.N.Y. Aug. 14, 2006) (in a case where the employer claims that the plaintiff was fired for misconduct, "[t]he appropriate inquiry is whether [the

employer] . . . had a good faith reason to believe plaintiff had engaged in misconduct, [and] that such misconduct was in fact the reason for his firing").

Uribe offers three arguments as to why Reczek acted unreasonably, or in bad faith, when he made the decision to terminate Uribe's employment based on Frantz's investigation. (Pltf. Br. at 5, 11-13)  None of these arguments has any merit.

First, Uribe asserts that Smith lied in his interview with Frantz. (Pltf. Br. at 4-5)  However, whether or not Smith lied, there is no evidence that Reczek relied on Smith's account of the incident in deciding to terminate Uribe's employment. Indeed, Reczek terminated Smith's employment even though Smith claimed he "never touched" Uribe. (See supra pp. 3, 5; Def. Ex. 14)  Independent of Smith's statement, Reczek had the accounts of two witnesses (Bizzoco and Selin) that Uribe had yelled "close the fucking door" and had head-butted Smith. (See supra pp. 3-4)  This conduct violated the Company's policies, and Uribe has not explained why Reczek was not entitled to rely on this evidence in deciding to terminate Uribe's employment.

Second, Uribe argues that Frantz's record of Bizzoco's statement should not have been relied upon because there are discrepancies between that record and Bizzoco's deposition testimony a year later. (Pltf. Br. at 4)  However, a plaintiff cannot show pretext merely by "attacking the reliability of the evidence supporting [the employer's] . . . conclusions," McPherson, 457 F.3d at 216 (emphasis in original), at least where, as here, there is no allegation or evidence that the allegedly unreliable evidence was given to the decisionmaker in bad faith, or relied on by the decisionmaker in bad

14

faith.[9]  Uribe has not offered any evidence that Bizzoco gave an inaccurate account because of discriminatory animus, or that Frantz recorded his account inaccurately because of discriminatory animus.  Nor has Uribe offered any evidence that Reczek acted in bad faith in relying on Frantz's statement that Bizzoco told her that he witnessed Uribe head-butt Smith.

Third, Uribe points out that Frantz's notes do not disclose that Selin was a "good friend" of Smith, that Selin believed that Uribe did not direct his shout to "close the door" at Smith in particular, and that Selin thought that Uribe only touched Smith after Smith attacked him.  (Pltf. Br. at 4)  However, as with Bizzoco, Uribe has not offered any evidence that any deficiencies in Frantz's investigation as to Selin were caused by Frantz's or Selin's discriminatory animus.  Similarly, while Uribe argues (Pltf. Br. at 5) that Frantz "conducted a shoddy investigation" and that Keebler "subsequently made a poorly informed decision to fire" him, so long as there is no evidence that "it was . . . discriminatory animus that motivated" Frantz or Keebler, Uribe cannot prevail. Jordan v. Olsten Corp., 111 F. Supp. 2d 227, 236 (W.D.N.Y. 2000); see also Rodriguez v. City of New York, No. 05-Civ.-5117, 2008 WL 420015, at *13 (E.D.N.Y. Feb. 11, 2008) ("The fact that an employee disagrees with the results of an employer's decision regarding termination, or even has evidence that the decision was objectively incorrect or was based on a faulty investigation, does not automatically demonstrate, by itself, that the employer's proffered reasons are a pretext. . . ."); Ascione, 312 F. Supp. 2d at 578 ("[i]t would be improper for the Court to second-guess [the employer's] investigation, or make

---

[9] In McPherson, the court noted that if an employer reaches its decision through "bizarre or duplicitous processes," there might be grounds for inferring pretext or discriminatory motive. Id., 457 F.3d at 216 n.7.  Uribe has not made any such showing here, however.

15

an independent determination as to whether or not . . . [the plaintiff] intentionally" engaged in misconduct).

Uribe has offered no factual basis for a jury to find that Reczek acted unreasonably or in bad faith, much less that Reczek was motivated by discriminatory intent. The undisputed facts are that Reczek believed that Uribe had violated Keebler's workplace violence policies and the collective bargaining agreement, based on Frantz's investigation and her interviews of Uribe, Smith and two witnesses. (See supra pp. 3-5) Regardless of Uribe's account of what happened, Reczek "was entitled to rely on" the witnesses' statements "and to terminate [Uribe] . . . based on the reports of . . . [his] misconduct." Middleton v. Metropolitan Coll. of New York, 545 F. Supp. 2d 369, 376 (S.D.N.Y. 2008); see also Strickland v. County of Monroe, No. 00-Civ.-6595, 2005 WL 1522802, at *5 (W.D.N.Y. June 28, 2005) (where employer's decision was based on report of what witnesses told individual who investigated plaintiff's references, plaintiff's denial of the conduct reported by witnesses was insufficient to defeat summary judgment); Johns v. Home Depot U.S.A., Inc., No. 03-Civ.-4522(DC), 2005 WL 545210, at *7 (S.D.N.Y. March 8, 2005) (granting summary judgment to employer where it decided to fire plaintiff based on undisputed evidence that plaintiff was involved in an altercation and witness statements attesting to plaintiff's prior conduct, and where there was no evidence that employer "acted in bad faith during the course of its investigation").

Where, as here, the defendant has "made a properly supported motion for summary judgment showing that . . . [it] fired [the] plaintiff because . . . [it] believed he had [engaged in misconduct, it is] . . . incumbent upon [the] plaintiff to present 'specific facts' – not . . . speculation, surmise, or 'feelings' – to show the existence of genuine

16

issues for trial." Agugliaro, 927 F. Supp. at 748. Because Uribe has failed to offer such evidence, Keebler is entitled to summary judgment.[10]

## CONCLUSION

For the reasons stated above, Keebler's motion for summary judgment (Docket No. 20) is GRANTED and the Complaint is dismissed. The Clerk of the Court is directed to close this case.

Dated: New York, New York
April 21, 2009

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge

---

[10] The Complaint can also be read as asserting a hostile work environment claim. (See Cmplt. ¶¶ 26-28 (alleging, inter alia, that Keebler "long condoned a work environment hostile to plaintiff and others of Latino/Hispanic descent")) In its memorandum of law in support of its motion for summary judgment, Keebler argues that it is entitled to summary judgment on this claim. (Def. Br. at 21-23) However, Uribe does not address his hostile work environment claim in his memorandum of law opposing summary judgment. Accordingly, this Court concludes that Uribe has abandoned this claim and it will be dismissed. See, e.g., Grana v. Potter, No. 06-Civ.-1173(JFB)(ARL), 2009 WL 425913, at *15 (E.D.N.Y. Feb. 19, 2009) (considering claim abandoned because plaintiff's summary judgment opposition "contained no factual or legal discussion" of the claim); Bronx Chrysler Plymouth, Inc. v. Chrysler Corp., 212 F. Supp. 2d 233, 249 (S.D.N.Y. 2002) (dismissing claim as abandoned because party opposing summary judgment "made no argument in support of th[e] claim at all" in its summary judgment opposition papers); Douglas v. Victor Capital Group, 21 F. Supp. 2d 379, 393 (S.D.N.Y. 1998) (dismissing as abandoned claims that defendants addressed in motion for summary judgment but plaintiff failed to address in his opposition papers).